UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAN LONDO,

     Plaintiff,                      Civil Case No: 2:18-cv-00223

v                                   Hon. Gordon J. Quist

UP HEALTH SYSTEMS-MARQUETTE,

     Defendant.

_____ /

| | |
|---|---|
| Sandra Hanshaw Burink (P68619) | Susan D. MacGregor (P41741) |
| Hanshaw Burink, PLC | Kitch Drutchas Wagner Valitutti & Sherbrook |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 501 Hillside Drive | 1440 West Ridge Street, Suite C |
| Marquette, MI  49855 | Marquette, MI  49855 |
| (906) 273-1551 | (906) 228-0001 |
| shburink@hb-lawofffices.com | susan.macgregor@kitch.com |
| | |
| | Mark W. Peters (TN BPR No. 018422) |
| | T. Connor Dugosh (TN BPR No. 036788) |
| | Waller Lansden Dortch & Davis LLP |
| | Attorneys for Defendant |
| | 511 Union Street, Suite 2700 |
| | Nashville, TN 37219 |
| | (615) 244-6380 |
| | mark.peters@wallerlaw.com |
| | connor.dugosh@wallerlaw.com |

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

## I.   INTRODUCTION

      One of Plaintiff's most important job responsibilities as a licensed practical nurse

was to record patient notes and physician orders accurately and timely in the Hospital's

electronic medical records system.   Failure to do so can have real consequences on

4850-4848-9908.3

1

patient health and safety.  So, when Plaintiff failed to meet that responsibility early in her employment, the Hospital, in an effort to help her improve, coached and counseled her as part of its progressive disciplinary process.  In her self-evaluation, Plaintiff recognized that she was not meeting performance expectations, and she concedes that her supervisor likewise believed honestly and in good-faith that she was not meeting performance expectations.  Unfortunately, Plaintiff's performance did not improve; it actually got worse.

In September of 2017, Plaintiff was responsible for entering surgical orders for a patient and scheduling a procedure to remove a mass found in that patient's lung.  She failed to do so.  Eleven days later, the patient went to the Hospital's emergency room complaining of increased pain.  The mass had doubled in size and the patient required an emergency operation.  Upon reviewing the patient's medical file, the Hospital learned that Plaintiff never scheduled the required pre-operation test, despite making notes that it was necessary and would be scheduled.  As a result, it terminated her employment.

Plaintiff claims that the Hospital terminated her because of her disability (depression and anxiety) and in retaliation for requesting an accommodation despite admitting that she never told anyone at the Hospital that she was disabled or that she needed any accommodation.  Her claims must be dismissed as a matter of law for those two reasons alone.  They also must be dismissed because she admits that the Hospital had an honest good faith belief that she engaged in the conduct for which she was terminated—indeed she admits that she did it—and that she is unaware of anyone outside her purported protected activities that was treated differently.  Plaintiff also claims that

4850-4848-9908.3

she was subjected to a hostile work environment because of her disability and points to some isolated and wholly unconnected comments by a co-worker about her "back" and vague complaints that she was being "singled out" and "watched."  Respectfully, putting aside her admission that she never told anyone at the Hospital about her purported disability (and thus cannot prove harassment based on some undisclosed condition), her proof of harassment falls well short of the "severe or pervasive" standard.  It too must be dismissed as a matter of law.

The undisputed facts and applicable well-settled law are fatal to Plaintiff's legal theories.  Summary judgment in favor of the Hospital is required as a matter of law.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Plaintiff's Hire.

The Hospital hired Plaintiff as a Licensed Practical Nurse ("LPN") in its Heart and Vascular Department on October 10, 2016.  (Deposition of Jan Londo ("Londo Dep.") at 20).  Plaintiff's primary job responsibilities included taking and recording patient vital signs and medical history, placing surgical orders and scheduling surgeries, verifying medication and dosages, and entering "clinic days" into the Hospital's electronic patient medical records system, which is a process that ensures all patient records are kept up-to-date with each visit.  (*Id*. at 23, 39-41).  The duties and responsibilities of an LPN are crucial to patients' treatment because they assure that all medical histories and orders are updated accurately and on time.  (*Id.* at 44-45).  Plaintiff summed up the critical importance for LPNs inputting patient information timely and accurately:  when physicians and nurses electronically enter "into [a patient's] chart and make[] reference to it, then

4850-4848-9908.3

3

they have to have a bird's-eye view of exactly what was done and what still needs to be done" to best treat the patient.  (*Id.*).

Within the first weeks of her employment, Plaintiff completed new hire orientation and discussed her job responsibilities with her supervisor, Senior LPN Brandi Goodwin. (*Id.* at 23-24).  She also received and acknowledged her review of and agreement to comply with the Employee Handbook and Code of Conduct, which includes the Hospital's policies prohibiting discrimination and harassment in the workplace as well as the process for requesting accommodations.  (*Id.* at 28-29, Exs. 2-3).

During Plaintiff's initial ninety-day probationary period, she shadowed nursing staff and was ultimately assigned to work for cardiovascular surgeon Dr. Bradford Blakeman. (*Id.* at 24, 54-55).  Despite having ample opportunities to do so, Plaintiff never disclosed to anyone during her probationary period (or any time thereafter) that she suffered from any disability or medical condition, or that she needed any accommodation to complete her work duties.  (*Id.* at 67-71, 96).  In fact, Plaintiff admitted that her purported disability—anxiety and depression—did not require any accommodations at the beginning of her employment.  (*Id.* at 96).

**B.    Plaintiff's Work Performance Deficiencies and Her Leave of Absence.**

Before the end of Plaintiff's initial ninety-day probationary period, Ms. Goodwin discovered that Plaintiff failed to complete certain tasks timely and failed to document patient information accurately.  (*Id.* at 47-49, Ex. 4).  On December 5, 2016, Ms. Goodwin met with Plaintiff to reiterate and review appropriate Hospital processes on documentation and task completion, to inform Plaintiff of areas in which she needed to improve, and to

4850-4848-9908.3

provide the tools and resources that would allow Plaintiff to do so.  (*Id.* at 48-51, Ex. 4).

Plaintiff agreed with Ms. Goodwin's assessment of her work performance, confirmed in

writing the record of their conversation and requirement that she improve, and committed

to "strive to become improved."  (*Id.* at 47-48, Ex. 4).

Just a few weeks later, Plaintiff mixed up two patients and placed health

information of one into the medical file of the other.  (*Id.* at 52-54, Ex. 5).  Plaintiff's error

resulted in the attending surgeon recording medical information in the wrong patient's file.

(*Id.*).  Upon learning of Plaintiff's errors, Ms. Goodwin counseled Plaintiff. (*Id.*).  Plaintiff

acknowledged her mistake and confirmed that similar errors in the future could lead to

disciplinary action, including termination.  (*Id.*).  Disappointingly, Plaintiff continued to

underperform.

Between February and May 2017, Plaintiff consistently failed to complete tasks

and assignments.  (Deposition of Bryan Breeser ("Breeser Dep.") at 20).  Because Plaintiff

did not like working with Dr. Blakeman—who (along with all other cardiovascular

surgeons) she described as "abrasive" (Londo Dep. at 32, 97)—and in an effort to try

anything that might help improve her performance, Mr. Breeser reassigned Plaintiff to

work for Dr. Curtis Marder, another cardiovascular surgeon in the same department as

Dr. Blakeman who managed a smaller patient load.  (Londo Dep. at 58-59; Breeser Dep.

at 20).  Plaintiff thanked Mr. Breeser for the reassignment and agreed that it would be a

better fit for her.  (*Id.* at 59-61).  Mr. Breeser met with Plaintiff on May 20 to discuss her

new assignment.  (*Id.* at 71-72, Ex. 7; Breeser Dep. at 20-22).  Because the

responsibilities of an LPN in the cardiovascular department are the same regardless of

4850-4848-9908.3

the assigned surgeon, additional training for Plaintiff was minimal:  Plaintiff would use the exact same systems the Hospital trained her to use for Dr. Blakeman and the other cardiovascular surgeons.  (Breeser Dep. at 20-21; Goodwin Dep. at 22-24).

Just two days after meeting with Mr. Breeser, Plaintiff told Ms. Goodwin that she needed "assistance" because other LPNs were "too busy" with their own workload to help her.  (Goodwin Dep. at 16-19, Ex. 2).  Ms. Goodwin met with Plaintiff and answered all of her questions about Dr. Marder's preferences, such as scheduling.  (*Id.*).  Plaintiff could have but did not tell Ms. Goodwin that she had any disability or medical condition. (Goodwin Dep. at 19-21; Londo Dep. at 65-67).  Plaintiff asked Ms. Goodwin if she could move to a different desk within the department because she did not get along with Theresa Harger, an LPN who Plaintiff thought was "whispering" about her to other nurses,[1] and because moving to a different desk "would get [Plaintiff] away from all of the commotion" and into "a quieter environment."  (Londo Dep. at 93; Goodwin Dep. at 15-16).  Plaintiff concedes that she did not believe Ms. Goodwin understood her comment to be a statement that Plaintiff suffered from a disability or needed an accommodation and that Plaintiff did not intend her comments to be understood or interpreted as

---

[1] Plaintiff claims that Ms. Harger whispered behind her back and "watched [her] constantly."  (Londo Dep. at 99).  Plaintiff conceded that she has no firsthand or secondhand knowledge of any "whispers" or conversations between other nurses, including Ms. Harger, the concerned Plaintiff or her medical condition.  (*Id*. at 105-08).  Plaintiff also does not have any knowledge or information to show that Ms. Harger was instructed by anyone to "watch" her.  (*Id*. at 99-100).  Rather, Plaintiff merely stated that she had a "feeling" that Ms. Harger's purported conduct was because of Plaintiff's purported anxiety or a disability, but did not provide any factual support for that "feeling."  (*Id.*).

communicating either.   (Londo Dep. at 67).   Ms. Goodwin does not recall Plaintiff's purported request to move desks, but does recall that no other desk was available. (Goodwin Dep. at 19-20; Breeser Dep. at 21).   Plaintiff did not follow up on her desk request.  (Londo Dep. at 69-70).

By mid-June 2017, Ms. Goodwin saw more errors committed by Plaintiff in recording medical information and concluded that Plaintiff's work performance was becoming a major issue for the department, not only as an inconvenience to its staff, but also one that could compromise patient care and safety.  (Goodwin Dep. at 27, 29).  Ms. Goodwin escalated her concerns to Mr. Breeser, who agreed that the Hospital should issue a corrective action if Plaintiff's poor performance continued.  (Breeser Dep. at 21-23).

Before the Hospital could issue any corrective action, Plaintiff called out sick on June 19, 21, and 22 for migraines.  (Londo Dep. at 80-82, Exs. 8, 9).[2]  On June 23, Mr. Breeser received a doctor's note excusing Plaintiff from work for an additional two weeks due to some undefined and unexplained "medical condition."   (Breeser Dep. at 18-19; Londo Dep. at 85-88, Ex. 9).  Pursuant to its general medical leave of absence policy, the Hospital approved her requests.  (Londo Dep. at 83-84).

---

[2] Plaintiff had called out occasionally from February to May 2017 with a migraine or upset stomach.  (Londo Dep. at 80-85, Ex. 8).  Mr. Breeser  approved all of Plaintiff's requests for sick days, which were recorded on February 27, March 16-17, and May 9-12, 2017.  (*Id.*).   Plaintiff never informed anyone that her sick day requests were the product of any chronic medical condition, anxiety or depression, or a purported disability.   (*Id.*).   Furthermore, all doctor's notes submitted to the Hospital by Plaintiff's physicians did not elaborate on her condition beyond stating that her time away from work was for a "medical condition."   (*Id.* at 85-87, Ex. 9).

4850-4848-9908.3

During Plaintiff's leave, Ms. Goodwin discovered more errors committed by Plaintiff. (Goodwin Dep. at 26-29). For example, Plaintiff failed to input eight weeks' worth of surgical orders and clinic days for urgent care patients. (*Id.*). Plaintiff also failed to confer with Dr. Marder or review his calendar for any conflicts before scheduling three patient surgeries. (Goodwin Dep. at 26-29; Londo Dep. at 124-26).

Near the end of her medical leave, Plaintiff met with the Hospital's Human Resources Generalist, Kristin Casey. (Londo Dep. at 88-89). Plaintiff recalls telling Ms. Casey that she had a "medical condition," without providing any further details, for the sole purpose of having Ms. Casey "hang on to it" so that Plaintiff could have time to "see how [her return to work] goes." (*Id.* at 88-90).

On July 24, Plaintiff returned to work. (*Id.* at 123-24). As with all other notes from Plaintiff's physician, the Return to Work/Fitness for Duty note did not describe Plaintiff's medical condition, provide any diagnosis or elaborate on the reason for Plaintiff's leave. (*Id.* at 85-87, Ex. 9).

**C.   Annual Evaluation and Corrective Action.**

In August of 2017, Plaintiff completed a self-evaluation as part of the Hospital's annual employee evaluation process. (Londo Dep. at 109, Ex. 11). She acknowledged her performance shortcomings candidly, rating herself correctly as "inconsistently [meets] standards" with respect to her accountability and job-specific knowledge. (*Id.*). Plaintiff concedes that she knew that her work performance must improve and that she should have been "further along" than she was. (*Id.* at 111-13, 115). Ms. Goodwin agreed, rating Plaintiff as "inconsistently met standards" or "did not meet standards" for most areas of

4850-4848-9908.3

8

Plaintiff's annual evaluation.  (*Id.* at Ex. 11; Goodwin Dep. at 16-17).  Plaintiff has no reason to believe that Ms. Goodwin did not honestly think that she failed to meet the Hospital's expectations and that Plaintiff had committed "serious mistakes and omissions" in her work.  (Londo Dep. at 121).

Consistent with the poor evaluations, the Hospital issued Plaintiff a corrective action based upon her shortcomings in time management, inaccuracy, inattention to detail, and failure to follow the Hospital processes and procedures.  (*Id.* at 122, Ex. 12).  When asked if she agreed with the contents of the Correct Action form, Plaintiff checked "Yes."  (*Id.* at 131, Ex. 12).  During the evaluation and corrective action process, Plaintiff never told Mr. Breeser or Ms. Goodwin that she suffered from a disability or medical condition or that she needed any type of accommodation.  (*Id*. at 140).

**D.      Plaintiff's Continued Poor Performance Results in a Performance Improvement Plan.**

Despite the Hospital's best efforts to assist her, Plaintiff did not improve her performance.  In late August, Mr. Breeser learned that Plaintiff failed to complete surgical orders and failed to schedule surgeries for Dr. Marder.  (Breeser Dep. at  34).  Ms. Goodwin learned that Plaintiff often went missing during her shift, failed to chart patient records correctly, and received complaints from patients about scheduling errors.  (Goodwin Dep. at 17, 29-30, 53-54).  Ms. Goodwin counseled Plaintiff multiple times to discuss her assignments and progress.  (Londo Dep. at 162).

As a result, the Hospital implemented a formal Performance Improvement Plan ("PIP") for Plaintiff on September 14, 2017.  (*Id.* at 145, Ex. 13).  Plaintiff admits that the Hospital was completely justified in putting her on the PIP and that the PIP was absolutely

4850-4848-9908.3

merited by her poor performance. (*Id.* at 145). The PIP accurately summarized the Hospital's efforts to help Plaintiff improve her performance, set forth a 45-day time table to reassess whether Plaintiff had made satisfactory progress towards the goals outlined in the PIP, and made clear the consequences if she failed to do so. (*Id.* at 144-46, Ex. 13; Breeser Dep. at 33). Plaintiff understood that her failure to meet the expectations outlined in the PIP would result in further disciplinary action, up to and including termination. (Londo Dep. at 163).

**E.    Termination.**

Before Mr. Breeser could evaluate Plaintiff's adherence to the PIP, he learned that she failed to update a medical record which directly impacted a patient's treatment. (Breeser Dep. at 42-43). Plaintiff was assigned to enter surgical orders for a patient and schedule a procedure to remove a mass found in that patient's lung. (*Id.* at 42-43; Goodwin Dep. at 55). On September 26, <u>eleven days</u> after the patient's follow-up appointment, the patient presented to the Hospital's emergency room with increased pain. (Breeser Dep. at 42-43; Goodwin Dep. at 55). The Hospital uncovered that the mass had doubled in size, and the patient required an emergency operation. (Breeser Dep. at 42-43; Londo Dep. at 163-76, Ex. 14; Goodwin Dep. at 55). Upon reviewing the patient's medical file, Mr. Breeser learned that Plaintiff never scheduled the required and ordered pre-operation test, despite making other notes that such test was necessary and would be scheduled. (Breeser Dep. at 42-43; Londo Dep. at 163-76, Ex. 14). That was the last straw and Plaintiff had to go. (Breeser Dep. at 35, 42-43).

4850-4848-9908.3

In consultation with the Hospital's Human Resources Director Kelly Gaul-Hauser, Mr. Breeser made the decision to terminate Plaintiff's employment.  (Breeser Dep. at 36, 42-43; Londo Dep. at 176-77, Ex. 15).  Plaintiff concedes that she had no evidence that the reasons provided for her termination were not the real reasons for her termination. (Londo Dep. at 180, 183).

### III.    <u>LEGAL ANALYSIS</u>

Plaintiff asserts claims of disability discrimination and a hostile work environment on the basis of a disability under the Americans with Disabilities Act of 1990, as amended ("ADA"). She also asserts a disability based retaliation claim under the Elliott-Larsen Civil Rights Act ("ELCRA").  All fail as a matter of law.

### A.    **Plaintiff Cannot Establish a *Prima Facie* Case of Disability Discrimination.**

To establish a *prima facie* of disability discrimination, Plaintiff must prove:  (1) she is disabled; (2) she is qualified for the position with or without reasonable accommodation; (3) she suffered an adverse employment action; (4) the Hospital knew or had reason to know of her disability; and, (5) she was replaced or her position remained open.  *Arthur v. Am. Showa, Inc.*, 625 Fed. Appx. 704, 707 (6th Cir. 2015).  Plaintiff cannot do so because she cannot show that the decision-makers, Mr. Breeser and Ms. Gaul-Hauser, knew about her purported disability.  Plaintiff's speculation that they <u>must</u> have known she was disabled because they may have been aware of *symptoms* of her purported disability (which of course could be "symptoms" of a variety of things, medical and non-medical) is not sufficient to withstand summary judgment.

1.    *Plaintiff Admits That She Never Told the Hospital That She Was Disabled or Needed Any Accommodations for a Disability.*

For the Hospital to have discriminated against Plaintiff because of her purported disability, as the Complaint alleges, she must prove that it had knowledge of the disability. *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013).  *Id.*  Indeed, it is common sense as well as well-settled law that that an employee "cannot be considered to have been fired on the basis of disability unless the individual decision-maker who fired the individual had knowledge of that disability."  *Id.* (emphasis added).  Here, Plaintiff admits that she never actually disclosed that she had a disability to the Hospital or that the decision-makers (Ms. Gaul-Houser and Mr. Breeser) knew or should have known that she was disabled.

i.    Plaintiff Relies Upon Statements She Purportedly Made to Hospital Employees That Generally Described Anxiety to Support Her Contention That She Also Disclosed Suffering from a Disability.

An employer has notice of a disability when an employee tells the employer that she is disabled.  *Hammon v. DHL Airways, Inc.*, 135 F.3d 441, 450 (6th Cir. 1999). Plaintiff never did.  (Londo Dep. at 63-67, 88-90, 141-43; Goodwin Dep. at 16, 19-20; Breeser Dep. at 35; Casey Dep. at 16).  So, Plaintiff tries a different tack, one unrecognized by applicable law, by claiming that the Hospital—and specifically the decision-makers—should have known she suffered from an anxiety disorder and depression based upon three conversations:  (1) sometime in April 2017, she told Ms. Goodwin that Ms. Harger, her co-worker, gave her "great anxiety" and that she would like to move desks; (2) sometime in June 2017, she asked Mr. Breeser to go home following

4850-4848-9908.3

an "anxiety attack"; and, (3) sometime in July 2017, she told HR Generalist Kristin Casey that she had some "medical conditions."  (Londo Dep. at 88-90, 141-43).  Her theory rests on statements that only generally describe workplace anxiety that some employees experience, regardless of whether they have a disability or not; as a matter of law, they are entirely insufficient to prove that the Hospital actually learned of her disability or should have realized it.  *Cf. Van Compernolle v. City of Zeeland*, 2006 U.S. Dist. LEXIS 32963, *36 (W.D. Mich. May 24, 2006) (Bell, J.) ("[S]peculation about the cause of a problem does not impute knowledge to Defendants."); *Rogers v. CH2M Hill, Inc.*, 18 F. Supp. 2d 1328, 1337 (M.D. Ala. 1998) ("An employer would probably never be held to have imputed knowledge of a depression or an anxiety disorder of its employee.  Asking the employer to guess at such is asking too much of the employer, and of the ADA.").

With respect to Plaintiff's direct supervisor Ms. Goodwin, Plaintiff says she told Ms. Goodwin that she became nervous around her because Ms. Goodwin "didn't understand when [Plaintiff] asked for certain things" concerning requests for "peace and quiet" (Londo Dep. at 63-64), and that Ms. Harger gave Plaintiff "great anxiety."  (*Id.* at 141).  This conversation does not support a finding that Ms. Goodwin should have realized that Plaintiff was discussing or referring to a physical or mental impairment substantially limiting a major life activity, as the ADA prescribes.  *See Rogers*, 18 F. Supp. 2d at 1338 (finding that vague statements referencing "feeling kind of down and depressed" did not give notice to employer of plaintiff's disability, even if evidence supported that the plaintiff exhibited some behaviors which "may be considered symptoms" of anxiety).  Even more,

Plaintiff contradicted herself when asked if she ever told Ms. Goodwin that she had anxiety, and she flat-out denies telling Ms. Goodwin that she was disabled:

Q.    Did you ever tell [Ms. Goodwin] that you suffered from a disability?

A.    I told her that I had anxiety.  I don't recall when and how and where, but I told her and it may have been during that time of converting over to a new doctor, I don't know . . .

. . .

Q.    [W]as it just in general, 'Hey, Brandi, I need some space' or did you tie that conversation back to a medical condition that you suffer from?

A.    What I told her was that I find it best to be able to concentrate on what I am doing if I can -- You know, if I could have another desk, have all of my stuff there, instead of hauling it back and forth, and she denied that . . .

. . .

Q.    When she denied it, did you ever tell her that you had a disability?

A.    Okay.  I didn't go to [Ms. Goodwin's] office and say, 'Hey, I have an anxiety disorder' because up until I started working there, I was very able to manage.  And working there, with the pressure, the intensity, and I think most of it was just, I felt, a lack of support.  I have never, ever had a mental break like that before and be on the edge of one every single day that I went in there because it was so chaotic.  No one respected quietness.  If there were no doctors in the office, everybody -- well, mainly here, and if the mid-level is there, talking about Pilates class or whatever else.  And that's not how I function. And I shared that I needed to be able to function better.  So without saying, you know, 'Well, I have anxiety,' I am sure [Ms. Goodwin] got it -- or I hope she did but yet . . .

Q.    Do you think [Ms. Goodwin] did get it?

A.    I am thinking now, no.  I don't know.

4850-4848-9908.3

(Londo Dep. at 65-67).  Accordingly, with whatever language Plaintiff used to describe noise levels at the Hospital to Ms. Goodwin or her issues with Ms. Harger, Plaintiff admits that she does not believe Ms. Goodwin became aware of her disability.  (*Id.*).

To support her argument that *Mr. Breeser* must have been aware of her disability, Plaintiff says that, one afternoon in June, she told him that she had suffered an "anxiety panic attack" and needed to go home.  (Londo Dep. at 140-41, 143-44).  Plaintiff does not contend that she ever told Mr. Breeser that she suffered from a disability during this conversation or why she suffered an "anxiety panic attack" or if was an actual medical condition.  (*Id.* at 140-41, 143-44).  Mr. Breeser recalls allowing Plaintiff to go home early that day, and he denies that he ever became aware of her disability.  (Breeser Dep. at 35).   Again, and like Ms. Goodwin, Plaintiff urges the Court to assume that Mr. Breeser speculated so far into her comments describing her workplace anxiety generally to discern that Plaintiff was disabled within the meaning of the ADA.  Despite Plaintiff's effort to keep this claim alive, the Hospital is not required to make such factual leaps or speculate as to Plaintiff's medical condition and history.  *See, e.g.*, *Lippman v. Sholom Home, Inc.*, 945 F. Supp. 188, 192 (D. Minn. 1996) ("[A]n employer is not obligated to observe employees for any behavior which may be symptomatic of a disability, and then divine that the employee actually suffers from a disability.").

Furthermore, nothing in the record suggests that Ms. Gaul-Houser was aware of Plaintiff's purported disability.  Plaintiff, instead, relies on a conversation she had with Kristin Casey, a new Human Resources Generalist at the time, where Plaintiff says she shared that she suffered from "medical conditions" when asking permission to apply for a

4850-4848-9908.3

different position within the Hospital system.  (Londo Dep. at 88-90).  Plaintiff, however, testified that she did not ask Ms. Casey to do anything with that information, but rather just "hang on to it."  (*Id.*).  Plaintiff admitted that she did not go into detail about those "medical conditions," (*Id.* at 89, 196; Casey Dep. at 16-17), and Ms. Casey recalls that the conversation only covered Plaintiff's request to apply for a transfer because, as Plaintiff expressed, she was "stressed" about the demands of her position.  (Casey Dep. at 16).

For the reasons set forth in Sections III.A.1.ii and iii, *infra*, the Court should reject Plaintiff's theory that knowledge of some symptoms equals knowledge that she is disabled.

      ii.   Knowledge of Plaintiff's Symptoms Does Not Equate to Knowledge of Her Purported Disability.

As a matter of law, Plaintiff cannot rely on the Hospital to speculate as to her medical condition to prove her case.  *See, e.g.*, *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 708 (6th Cir. 2015) (finding that while decision-maker was aware that the plaintiff had "restrictions," he was "wholly unaware" of any disability).   Knowledge of *symptoms* does not equate to knowledge of a *disability*.   *See id.* (affirming employer's summary judgment motion); *Hammon v. DHL Airways, Inc.*, 135 F.3d 441, 450 (6th Cir. 1999) ("Although Plaintiff told [his supervisors] about his loss of confidence, by his own admission he never suggested that his emotional problems stemmed from a condition of disability."); *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004) ("Knowing that an employee has health problems . . . is not the same as knowing that the employee suffers from a disability.").

4850-4848-9908.3

In *Van Compernolle v. City of Zeeland*, this Court found that an employee claiming disability discrimination did not provide notice of his disability when he relied on "isolated, stray references to his difficulties with [work responsibilities] and his own speculation of his [coworkers] that there may be something wrong with him."  2006 U.S. Dist. LEXIS 32963, *36 (W.D. Mich. May 24, 2006) (Bell, J.).  There, the plaintiff was diagnosed with Attention Deficit Hyperactivity Disorder, bipolar disorder, and depression, and he experienced difficulty filling out payroll sheets accurately.  *Id.* at *5-7.  However, he did not tell his employer about his diagnoses until after his termination.  *Id.*  This Court rejected the plaintiff's contention that his employer's knowledge of the plaintiff's difficulty completing certain work responsibilities and his fellow coworker's statement that "something was not right" gave the employer knowledge of his disabilities, holding "general references" to "some issue or a problem" does not equate to knowledge of a disability.  *Id.* at 36-37.

Like the plaintiff in *Van Compernolle*, Plaintiff relies on her own speculation of the Hospital's knowledge of her purported disability to support the knowledge prong of her *prima facie* case.  The Hospital, however, did not know of her disability based on work performance or general statements she made about being nervous or anxious, and the ADA "does not require clairvoyance."  *See, e.g.*, *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995).  Plaintiff only made general statements to Ms. Goodwin and Mr. Breeser as to the problems she was facing with her work assignments.  In that regard, she was not unlike many other employees who voice generalized anxiety about or problems with their work assignments.  As a matter of law, that is not enough to impute

4850-4848-9908.3

knowledge of a disability.  Without that knowledge, the Hospital could not have discriminated against Plaintiff, and she cannot meet her *prima facie* burden.

**B.      Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation.**

Plaintiff claims that the Hospital retaliated against her in violation of the Elliott Larsen Civil Rights Act ("ELCRA") by terminating her after she reported "discriminatory treatment" to Ms. Goodwin in September 2017.  (Docket No. 1 at ¶¶ 42-45).  As a threshold, Plaintiff's retaliation claim must be dismissed because the ELCRA prohibits retaliation on the basis of religion, race, color, national origin, age, sex, height, weight, and marital status, not disability.  *See* MCLS § 37.2101 et seq.  If Plaintiff wanted to assert a state law claim for retaliation, she should have sued under Michigan's Persons with Disabilities Civil Rights Act, MCLS § 37.1101 *et seq.* ("PWDCRA").  Her failure to do so is no different than suing for age discrimination under Title VII and not the Age Discrimination in Employment Act.  *See, e.g.*, *Clark v. City of Dublin*, 178 F. App'x 522, 524 (6th Cir. 2006); *Jorgensen v. Henry Ford Health Sys.*, 2018 U.S. Dist. LEXIS 168775, *25 (E.D. Mich. Sept. 30, 2018) ("There is no claim for age discrimination under Title VII."); *Wakefield v. Children's Hosp.*, 2008 U.S. Dist. 91835, *13-14 (S.D. Ohio Aug. 12, 2008) (dismissing age discrimination claim filed under Title VII because "Title VII does not protect against age discrimination").  Plaintiff's retaliation claim should be dismissed for this reason alone.  *See, e.g.*, *Hubbard-Klik v. United Am. Payrol 17, Inc.*, 2008 U.S. Dist. LEXIS 107624, *25-26 (E.D. Mich. Dec. 18, 2008) ("Being disabled . . . is not a protected classification under the ELCRA."); *Weibel v. Salon Nadwa & Day Spa, Inc.*, 2003 Mich. App. LEXIS 958, *2-3 (Mich. Ct. App. Apr. 15, 2003) (affirming dismissal of ELCRA claim

4850-4848-9908.3

18

for disability discrimination because "being disabled is not a protected classification" under the ELCRA).

Even if Plaintiff had sued under the appropriate statute, her retaliation claim still must be dismissed on summary judgment.  To establish a *prima facie* case of retaliation under Michigan state law, Plaintiff must show that (1) she engaged in protected activity, (2) the Hospital knew of such activity, (3) the Hospital consequently took an employment action adverse to Plaintiff, and (4) a causal connection exists between the protected activity and adverse employment action.  *Marotta v. Ford Motor Co.*, 119 F. Supp. 3d 676, 698 (E.D. Mich. 2015); *Charboneau v. Severn Trent Labs.*, 2005 U.S. Dist. 36442, *15-16 (W.D. Mich. Dec. 1, 2005).  Plaintiff fails at the first step because she admits that she did not engage in any protected activity.  Her contention that she complained that "nobody communicat[ed]" with her upon her return from absences in August 2017 and that Ms. Harger commented that Plaintiff had a "spell" or "episode" is not "protected activity." Moreover, she has absolutely no evidence or proof that the decision-maker knew about her contentions.  Her retaliation claim must be dismissed.

1. *Plaintiff Did Not Engage in Protected Activity and Nothing in the Record Shows That the Hospital Thought She Did.*

The first element of Plaintiff's *prima facie* case requires her to prove that she engaged in protected activity, meaning that she "participated in a proceeding or opposed a violation" of the ELCRA.  *Charboneau*, 2005 U.S. Dist. LEXIS 36442 at *17.[3]  Plaintiff

---

[3] The Sixth Circuit has noted that the anti-retaliation provisions of the ELCRA and the PWDCRA are "materially identical" and have analyzed claims under each using the same prima

must also prove that the decision-makers <u>knew</u> that she engaged in protected activity.  *Id.*  Of course, not every generalized complaint is "protected activity."  *Id.* at *17.

It is unclear what activity Plaintiff purports to have been "protected" under the law.  Plaintiff alleges that she complained to Mr. Breeser and Ms. Goodwin on an unknown date that Ms. Harger's purported "whispering" and "watching" made her feel "very, very violated."  (Londo Dep. at 204-05).  Plaintiff, however, conceded that she had no firsthand knowledge that those purported "whispers" were about her or her purported disability.  (*Id.* at 105-08).  Plaintiff also conceded that she did not tell Mr. Breeser or Ms. Goodwin that she felt discriminated against for any reason, much less because of a disability:

> Q.   Did you ever complain specifically to anybody about being discriminated against because of a disability?  Specifically, like did you --
>
> A.   Like, 'I have a disability and I'm being picked on?'
>
> Q.   Yeah.
>
> A.   That's not my style.  I told [Ms. Goodwin] and [Mr. Breeser] that I felt violated.  I really think that that pretty much sums it up.

 (*Id.* at 205).  Plaintiff did not follow-up with either thereafter because she did not feel as if a "door opened" by her conversation.  (*Id.*).  It is impossible for the Hospital, Mr. Breeser, or Ms. Goodwin to have retaliated against Plaintiff for complaints that she never made.

At best, Plaintiff's comments about Ms. Harger were generalized comments and statements regarding her disagreement and discomfort with a coworker, untethered to

---

facie elements.  *See, e.g.*, *MacDonald v. United Parcel Service*, 430 Fed. App'x 453, 463 (6th Cir. 2011).

4850-4848-9908.3

any medical condition, disability or allegation of discrimination or retaliation.  The Sixth Circuit has made clear that "[g]eneral complaints to management do not constitute protected activity when the plaintiff does not object to discriminatory conduct against her based on her membership in a protected class."  *Jenkins v. Regents of the Univ. of Mich.*, 763 Fed. App'x 545, 553 (6th Cir. Feb. 26, 2019).  Plaintiff has no more.  Her retaliation claim fails for that reason alone.

2. *No Causal Connection Between Her Complaints About Ms. Harger and Her Termination.*

Plaintiff also does not make any connection between her complaints about Ms. Harger and her termination.  To establish a *prima facie* case for retaliation, she must show a causal connection between her protected activity and the Hospital's decision to terminate her employment.  *Charboneau v. Severn Trent Labs.*, 2005 U.S. Dist. 36442 at *15-16.  Michigan courts assess state claims of retaliation using the same general framework as used by federal courts for ADA claims.  *See Peoples v. FCA US, LLC*, 2017 U.S. Dist. LEXIS 79424, *24-25 (E.D. Mich. May 24, 2017) (ADA and PWDCRA); *Marotta v. Ford Motor Co.*, 119 F. Supp. 3d 676, 698 (E.D. Mich. 2015) (Title VII and ELCRA).  To establish causation under state law, Plaintiff must show that the alleged adverse employment action "would not have occurred but for" her participation in protected activity.  *Marotta*, 119 F. Supp. at 698.  A "causal connection can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis."  *Lawson-Brewster v. River Valley Sch. Dist.*, 2008 U.S. Dist. LEXIS 33060, at *92 (W.D. Mich. Apr. 22, 2008).

4850-4848-9908.3

21

Plaintiff cannot make <u>any</u> connection to the Hospital's decision to terminate her employment with any purported complaints that Plaintiff made about Ms. Harger, her coworkers, or her work environment.  Plaintiff agrees with the content of the Hospital's issued corrective action and Performance Improvement Plan, and she does not contest that the reasons offered for her termination—her continuous failure to complete her duties accurately and on time—were the true reasons for her termination.  (*See infra* Section III.C).  This admission alone defeats a contention that any complaints to Ms. Goodwin or Mr. Breeser could have played any factor in the decision to terminate her employment. *See Marotta*, 119 F. Supp. 3d at 696 ("Plaintiff admits that the problems documented in the disciplines actually occurred undermining her contention that the disciplines were taken in retaliation for [participating in a protected activity.").

## C.      Plaintiff Cannot Establish Pretext.

Plaintiff's claims of discrimination and retaliation also fail because she cannot prove that the Hospital's articulated legitimate, nondiscriminatory and non-retaliatory reasons for her termination—Mr. Breeser's and Ms. Gaul-Houser's honest and good faith belief that her poor work performance caused a direct threat of patient health and safety—were pretext for unlawful discrimination or retaliation.  Under the burden-shifting framework the U.S. Supreme Court adopted in *McDonnell Douglas Corp. v. Green*, if Plaintiff makes out a *prima facie* case, the Hospital must articulate a nondiscriminatory explanation for its action.  *Morrissey v. Laurel Health Care Co.*, 943 F.3d 1032, 1038 (6th Cir. 2019) (citations omitted).  The burden shifts then back to Plaintiff to prove that the Hospital's explanation is pretext for discrimination.  *Id.*  This analysis for pretext is identical

4850-4848-9908.3

for federal claims for discrimination and state claims for retaliation.  *See, e.g.*, *Robinson v. MGM Grand Detriot, LLC*, 2019 U.S. Dist. LEXIS 98479, *17-19 (E.D. Mich. June 12, 2019); *Macdonald v. UPS*, 2009 U.S. Dist. LEXIS 47457, *24-25 (E.D. Mich. June 5, 2009).  At all times Plaintiff bears the burden of establishing that illegal discrimination took place.  *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016).

Here, the reason for Plaintiff's termination is made clear by the record: she committed many, many errors resulting in threats to patient safety and care, despite having been provided with ample opportunities from the Hospital to improve her performance.  *See* Section II, *supra*.  Having met the Hospital's burden of production, Plaintiff's claims must be dismissed as a matter of law unless she can prove by a preponderance of the evidence that the Hospital's reasons were not its true reasons, but were rather a pretext for unlawful discrimination.  *See Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 883 (6th Cir. 1996).  A plaintiff can establish pretext by showing (1) the employer's asserted reason(s) has no basis in fact; (2) the reason(s) did not in fact motivate its decision to terminate; or, (3) if they were factors in the decision, they were insufficient to motivate the termination.  *Ferrari*, 826 F.3d at 891; *see also Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672, 681 (6th Cir. 2014); *Wright v. Memphis Light, Gas & Water Div.*, 558 Fed. App'x 548, 554 (6th Cir. 2014).  Plaintiff cannot make any such showing here.  Indeed, there is no genuine issue of material fact as to whether the Hospital's rationale was pretextual because Plaintiff conceded that the proffered reasons for her termination were, in fact, true.

4850-4848-9908.3

The undisputed history of Plaintiff's employment shows her consistent failure to perform her job adequately and that Plaintiff was well aware that she was committing multiple errors and omissions.  In quick summary, shortly after she began working the Hospital, Plaintiff required counseling because she did not document patient records accurately.  (Londo Dep. at 48-49, Ex. 4).  By January 19, 2017, Ms. Goodwin issued Plaintiff's first notice that more errors may result in her termination, which Plaintiff understood and with which she agreed.  (*Id*. at 52-54, Ex. 5).  Plaintiff continued performing poorly, which she acknowledged in her written self-evaluation in August of 2017, just weeks before her termination, and agreed that the she had not met the Hospital's standards with respect to her accountability and job-specific knowledge.  (*Id*. at 144-46, Ex. 11).  Plaintiff also admitted then that she had no reason to believe that Ms. Goodwin did not honestly think that Plaintiff failed to meet the Hospital's expectations or that Plaintiff had committed "serious mistakes and omissions."  (*Id.* at 111-13, 115, 121).

Continuing, in a corrective action issued on August 3, 2017, Plaintiff agreed that she erred by: (1) scheduling three surgeries for Dr. Marder before he gave permission, (2) failing to complete an "extensive" amount of orders, (3) failing to schedule certain procedures, (4) missing documentation in the electronic medical recording system, (5) failing to document phone or in-person conversations with patients, (6) amassing nearly two hundred unfinished assignments and tasks that required follow-ups or orders to be completed, and (7) entering incorrect surgery orders for patients.  (*Id.* at 122, Ex. 12).  Plaintiff does not contest the accuracy of the content of her corrective action—or even the occurrence of any of aforementioned errors and omissions—and she cannot point to any

4850-4848-9908.3

listed example that was untrue.  (*Id.* at 131).  In fact, when asked if she agreed with the characterization of these events, Plaintiff responded:  "If this was perceived by them, then it was."  (*Id.* at 124).[4]  She has produced no evidence whatsoever to even suggest that the errors and omissions which led to her termination did not actually happen.  Even more, Plaintiff acknowledged that the listed errors and omissions, such as failing to update patient records or schedule surgeries, could seriously jeopardize the health and safety of patients.  (*Id.* at 134-35).

Last but not least, Plaintiff does not contest that her Performance Improvement Plan was deserved and appropriate.  (*Id.* at 145).  Plaintiff does not disagree with the fact that the Hospital had genuine concerns about her failure to perform her job duties.  (*Id.* at 160-62, 180, Ex. 13).  And, she offers no explanation how the reasons provided to her during her termination, both in writing and in person, are causally related or connected to discrimination or retaliation, admitting that she "respect[s] what [the Hospital] wrote" when

---

[4] When asked directly if Plaintiff had any reason to doubt that the listed errors and omissions in her corrective action form were untrue, she stated that she was "going to pass on that question because [she] . . . need[s] examples" of those errors and omissions.  (Londo Dep. at 133).  Plaintiff contends that Ms. Goodwin and Mr. Breeser "should have gone into more detail" about the cited errors and omissions.  (*Id.* at 30).  Respectfully, her contention is a classic example of attempting to second guess the Hospital and substitute her judgment for her employer's.  Courts have routinely rejected such attempts, noting that they do not forestall summary judgment.  *See, e.g.*, Lee v. City of Columbus, 636 F.3d 245, 257-58 (6th Cir. 2011) ("It is not within the province of the courts to . . . act as super personnel departments to second guess an employer's facially legitimate business decisions."); *Miller v. Dep't of Natural Res.*, 2006 U.S. Dist. LEXIS 23145, *36-37 (W.D. Mich. Apr. 24, 2006) ("[C]ourts do not second guess an employer's business decisions."); *Bush v. American Honda Motor Co.*, 227 F. Supp. 2d 780, 797 (S.D. Ohio 2002).  Moreover, Plaintiff admits that she never asked either Mr. Breeser or Ms. Goodwin to provide any additional information or examples of her errors and omissions during the meeting and, instead, she just signed the document so she could "let it go and start over."  (Londo Dep. at 130, 136).

4850-4848-9908.3

referencing the termination document.  (*Id.* at 180, Ex. 15).  She respected those reasons because they were true.

In *Marotta v. Ford Motor Company*, the plaintiff filed a disability retaliation claim, among many others, against her employer.  119 F. Supp. 3d 676 (E.D. Mich. 2015).  Over the course of one year, the employer issued the plaintiff eight reprimands and warnings for various reasons, including for poor performance and tardiness.  *Id.* at 685-86.   The plaintiff "effectively admitted" through testimony that the problems underlying the disciplinary actions actually occurred.  *Id.* at 696, 698.  The court granted the employer's summary judgment motion and rejected the plaintiff's argument that she met her burden to show pretext for discrimination.  *Id.*  In doing so, the Court emphasized that, because the plaintiff "admit[ted] that the underlying issues in disciplines actually occurred," she in turn "provid[ed] a legitimate explanation for the reprimands."  *Id.*

Like the plaintiff in *Marotta*, Plaintiff cannot prove pretext.  She concedes that the Hospital's proffered reasons were based in facts that she does not dispute, and she does not contest that those were the real reasons that resulted in her termination.  Accordingly, her federal discrimination and state retaliation claims must be dismissed.

**D.    Plaintiff's Hostile Work Environment Claim Fails Because She Offers No Proof That She Was Subjected to Conduct Severe or Pervasive Enough to Constitute an Actionable Claim Under the ADA.**

To establish a hostile work environment claim under the ADA, Plaintiff must show: (1) she was disabled, (2) she was subject to unwelcome harassment, (3) the harassment was based on her disability, (4) the harassment unreasonably interfered with her work performance, and (5) the Hospital either knew or should have known about the

4850-4848-9908.3

26

harassment and failed to take corrective action. *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002).[5] To prevail, Plaintiff must show that the complained-of conduct is "sufficiently severe or pervasive to alter the conditions" of her employment and to "create an abusive working environment." *Id.* Merely offensive conduct does not support a hostile work environment claim. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Furthermore, "[c]onversations between an employee and [her] superiors about [her] performance does not constitute harassment simply because they cause the employee distress,'" particularly when "[t]here is no evidence that [the plaintiff] was ridiculed or insulted because of [the] medical condition." *Plautz v. Potter*, 156 F. App'x 812, 819 (6th Cir. 2005). Likewise, "personal conflict does not equate with discriminatory animus." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000). Summary judgment is appropriate where the "evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment." *Peoples v. FCA US, LLC*, 2017 U.S. Dist. LEXIS 79424, * 44 (E.D. Mich. May 24, 2017).

First, Plaintiff has failed to prove that anyone at the Hospital knew that she was disabled. *See* Section III.A, *supra*. Without such proof, Plaintiff cannot establish that anyone at the Hospital engaged in any hostile conduct because of or based upon her disability. *See, e.g.*, *Wilder v. Sumner Cty. Bd. of Educ.*, 2016 U.S. Dist. LEXIS 157240,

---

[5] For the same reasons outlined in Section A of this Motion, Plaintiff has put forth no evidence to show that the Hospital even knew of Plaintiff's purported disability such that a hostile work environment on the basis of a disability was even possible.

4850-4848-9908.3

*11-13 (M.D. Tenn. Nov. 14, 2016) (holding that hostile work environment could not exist if purported bad actors were not aware of the plaintiff's disability).

Second, Plaintiff cannot prove her hostile work environment claim because she has no evidence that the Hospital subjected her to conduct constituting <u>any form</u> of harassment, much less harassment so severe or pervasive to alter the conditions of her employment.

Third, Plaintiff cannot prove that any conduct by anyone at the Hospital unreasonably interfered with her work.  Plaintiff's own testimony, again, is damning to her claim, and her hostile work environment claim must be dismissed.

    1.    *Plaintiff Was Not Subjected to Any Harassment or Conduct That Even Suggests Harassment, and She Does Not Connect the Purported "Harassment" to Her Purported Disability.*

Plaintiff's evidentiary grounds for her hostile work environment claim is minimal at best, and nothing she alleges equates to more than petty and idiosyncratic annoyances with a coworker.  Plaintiff claims that Ms. Harger asked "how [Plaintiff's] back was" based on her previous knowledge of an injury that Plaintiff suffered at a different employer prior to her job with the Hospital.  (Londo Dep. at 93).  She also claims that Ms. Harger whispered behind her back and "watched [her] constantly" when she returned from leave in August 2017.  (*Id.* at 93).  Plaintiff cannot tie either accusation to her purported disability of anxiety and depression and concedes that she has no knowledge that anyone instructed Ms. Harger to "watch" her. (*Id.* at 99-100).  Likewise, she concedes that she does not know what any employee "whispered" about or if those "whispers" were even related to Plaintiff or her undisclosed purported disability.  (*Id.* at 105-08).

4850-4848-9908.3

Sixth Circuit law is clear:  to succeed on a disability-based hostile work environment claim, Plaintiff must show that the conduct or harassment "permeate[d] the workplace with discriminatory intimidation, ridicule, and insult to alter the conditions of the working environment." *Cole v. Swagelok Corp.*, 2017 U.S. Dist. LEXIS 175195, *20 (N.D. Ohio Oct. 23, 2017); *see also Taulbee v. Univ. Physician Group*, 2017 U.S. Dist. LEXIS 116756, *23 (E.D. Mich. July 26, 2017) (finding that a coworker following the plaintiff to the bathroom and yelling at the plaintiff for excessive bathroom breaks did not create a hostile work environment on the basis of disability).  Plaintiff cannot meet that standard.

The conduct that Plaintiff identifies to support her claim is not even objectively offensive.  There is no evidence to show that Plaintiff was ever ridiculed or insulted about her disability, and Plaintiff does not contend that she was.  (Londo Dep. at 202-04).  Furthermore, Plaintiff does not connect Ms. Harger's purported behavior to any disability.  When asked if she had "any information to make [her] believe that Ms. Harger's behavior towards [Plaintiff] was because of her anxiety and a disability," Plaintiff only said she has a "feeling" that it was.  (Londo Dep. at 99-100).  When asked what information could prove that "feeling," Plaintiff replied:  "I don't know.  I can't answer that." (*Id.*).  Plaintiff's "feeling"—unsupported by any fact—is just speculation and is insufficient to create a genuine issue of fact.  *See, e.g.*, *Holloway v. UPS*, 1997 U.S. Dist. LEXIS 7707, *19 (E.D. Mich. Apr. 14, 1997) (finding that plaintiff's "gut feeling" amounted to conjecture and speculation insufficient to support an inference of discrimination); *Agugliaro v. Brooks Bros.*, 927 F. Supp. 741, 747-48 (S.D.N.Y. 1996) (finding that a "feeling of discrimination"

did not constitute sufficient evidence to defeat summary judgment).  Summary judgment is required.

2.     *No Conduct by Any Person at the Hospital Unreasonably Interfered with Plaintiff's Work.*

For Plaintiff to succeed on her claim, she must also show that harassing conduct was so extreme that it "amount[ed] to a change in the terms and conditions of [her] employment."  *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).  Case law is clear that the standard is very high to show that a change in the terms and conditions of employment occurred as a result of harassing conduct.  *See, e.g.*, *Blackwell v. Prod. Action Int'l, Inc.*, 2006 U.S. Dist. LEXIS 92027, *27-37 (E.D. Ky. Dec. 18, 2006).

Plaintiff does not allege that her termination or any other adverse employment action or consequence flowed from the conduct that she contends supports her hostile work environment claim.  *See, e.g.*, *Kelly v. N.Y. State Office of Mental Health*, 200 F. Supp. 3d 378, 397 (E.D.N.Y. 2016) (finding that a statement that the plaintiff should "take time off so [her employer] could train another nurse" did not constitute an adverse employment action).  Instead, Plaintiff claims that when she returned back from leave, she was given the "silent treatment" and thought that people whispered behind her back—without knowing if those purported whispers even concerned her or her anxiety. (Londo Dep. at 103-06).  Plaintiff, in fact, stated that she "didn't *want* to know" what people may have whispered about, so she just returned to work.  (*Id.* at 106-07) (emphasis added).

Plaintiff was not demoted, she did not lose benefits, and she did not have fewer responsibilities as a result of the conduct that she purports created a hostile work

4850-4848-9908.3

30

environment.  *See Kelly*, 200 F. Supp. 3d at 397.  She conceded that her termination was due to her performance issues, thus it is separate from any comment that Ms. Harger made or Plaintiff's perception that Ms. Harger was condescending.  *See* Section III.C., *supra*.  Furthermore, Plaintiff's opinion that Ms. Harger was condescending in tone, shown through Plaintiff's examples such as Ms. Harger purportedly telling Plaintiff that she "should know" how to do certain assignments and that they already "went over" other tasks (Londo Dep. at 116, 147-48), in no way amounts to a change in the terms and conditions of Plaintiff's employment.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.").  Summary judgment is also required for this reason.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the Hospital's Motion for Summary Judgment and dismiss this action with prejudice.

/s/ T. Connor Dugosh
Mark W. Peters (TN BPR No. 018422)
T. Connor Dugosh (TN BPR No. 036788)
WALLER LANSDEN DORTCH & DAVIS, LLP
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
Phone: (615) 244-6380
Facsimile: (615) 244-6804
Email:  mark.peters@wallerlaw.com
        connor.dugosh@wallerlaw.com

Susan D. MacGregor (P41741)
Kitch Drutchas Wagner Valitutti & Sherbrook

4850-4848-9908.3

Attorneys for Defendant
1440 West Ridge Street, Suite C
Marquette, MI  49855
(906) 228-0001
susan.macgregor@kitch.com

4850-4848-9908.3